**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|                                   |   |                        |
|-----------------------------------|---|------------------------|
|                                   | ) |                        |
| IN RE:                            | ) | Chapter 7              |
|                                   | ) |                        |
| BERNARD TECHNOLOGIES, INC.,       | ) | Case No. 04-13617(MFW) |
|                                   | ) |                        |
| Debtor.                           | ) |                        |
| _____ | ) |                        |

**MEMORANDUM OPINION[1]**

Before the Court is the Request of Sumner A. Barenberg, Ph.D. for Allowance of Administrative Expense Pursuant to 11 U.S.C. § 503(b) (the "Request"). It is opposed by the United States Trustee (the "UST") and the chapter 7 trustee. For the reasons set forth below, the Court will deny the Request.


I.   BACKGROUND

Bernard Technologies, Inc. (the "Debtor") filed a chapter 11 petition on December 26, 2004. At that time, Dr. Barenberg was the Debtor's CEO and sole employee.

On February 2, 2005, three of the Debtor's shareholders filed a motion seeking appointment of a chapter 11 trustee. The Court held an evidentiary hearing on that motion on April 18, but reserved final decision. On April 20, the UST filed a motion to convert the case to chapter 7, which the Court granted after hearing testimony and oral argument on May 5, 2005. George L.

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

Miller (the "Trustee") was subsequently appointed the chapter 7 trustee.

On motion of the Trustee, the Court entered an Order on July 28, 2005, approving the sale of substantially all of the Debtor's assets for $1.475 million.  The Order also authorized the rejection, inter alia, of Dr. Barenberg's employment agreement (the "Employment Contract").

Dr. Barenberg filed the instant Request on August 23, 2005, seeking $132,276.41 as a chapter 11 administrative expense.[2]  His claim included (1) salary for the post-petition, pre-conversion period; (2) reimbursement of travel and other employment-related expenses for the same period; (3) accrued but unpaid vacation time; (4) reimbursement of fees paid to counsel for the Debtor's executive board for post-petition legal services; and (5) reimbursement of expenses incurred attending the Debtor's section 341 meeting of creditors post-conversion.

The UST and the Trustee filed objections to the Request on September 14 and 16, 2005, respectively.  An evidentiary hearing was held on the Request on October 3.  Dr. Barenberg testified and presented certain documentary evidence in support of his claims.  The UST and Trustee presented no witnesses but requested that the Court take judicial notice of the hearings held on the motions for appointment of a chapter 11 trustee and conversion to

---

[2]  Dr. Barenberg subsequently decreased his Request to reflect a post-petition payment of $24,000 for his salary.

2

chapter 7.  Over Dr. Barenberg's objection, the Court took judicial notice of the evidence presented at those hearings.

At the conclusion of the hearing, the Court denied the Request as to the accrued vacation time, attorneys' fees, and expenses for attendance at the post-conversion section 341 meeting of creditors.  The Court reserved ruling on the remainder of the Request pending review of further documentary support of the travel expenses, which was submitted on November 11, 2005. This matter is ripe for decision.

II.  JURISDICTION

This is a core proceeding over which the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(A), (B) & (O).

III. DISCUSSION

A.  Standard of Review

Section 503 of the Bankruptcy Code accords administrative expense priority to "the actual, necessary costs and expenses of preserving the estate, including . . . salaries . . . for services rendered after the commencement of the case."  11 U.S.C. § 503(b)(1)(A)(i).[3]  "For a claim in its entirety to be entitled

---

[3]  The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, which became effective on October 17, 2005, renumbered the relevant provision from section 503(b)(1)(A) to section 503(b)(1)(A)(i).

to . . . priority under § 503(b)(1)(A)[i], the debt must arise from a transaction with the debtor-in-possession and the consideration supporting the claimant's right to payment must be beneficial to the debtor-in-possession in the operation of the business." Calpine Corp. v. O'Brien Envt'l Energy, Inc. (In re O'Brien Envt'l Energy, Inc.), 181 F.3d 527, 532-33 (3d Cir. 1999) (citation omitted).

In order to hold administrative expenses to a minimum and to maximize the value of the bankruptcy estate, section 503(b) is narrowly construed. See, e.g., Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.), 853 F.2d 700, 706 (9th Cir. 1988). As such, the applicant seeking compensation or reimbursement under section 503(b)(1)(A)(i) carries a "heavy burden of demonstrating that the costs and fees for which it seeks payment provided an actual benefit to the estate and that such costs and expenses were necessary to preserve the value of the estate assets." Calpine, 181 F.3d at 533 (citation omitted). The applicant must prove his entitlement to the requested compensation and expense reimbursement by a preponderance of the evidence. See, e.g., In re TransAmerican Nat'l Gas Corp., 978 F.2d 1409, 1416 (5th Cir. 1992).

B.   Post-Petition Salary

Dr. Barenberg seeks $59,333.33 in unpaid compensation for the post-petition, pre-conversion period. This figure represents

4

four months' salary based on the $250,000 per annum salary
provided by the Employment Contract, less a post-petition payment
of $24,000.

Dr. Barenberg is entitled to an administrative expense only
for "the reasonable value of [those] postpetition services that
benefitted the estate." <u>Mason v. Official Comm. of Unsecured
Creditors (In re FBI Distrib. Corp.)</u>, 330 F.3d 36, 44 (1st Cir.
2003).

### 1.   Reasonable Value

Dr. Barenberg argues that the salary due under the
Employment Contract is the appropriate measure of the value of
his post-petition services.  He submitted documentary evidence
that his compensation package had been approved by a committee of
non-employee directors and by the Debtor's board of directors.
Further, he testified that his current salary is consistent with
the salary he earned at two similar companies prior to 1994.[4]
Consequently, Dr. Barenberg insists that, had the Debtor obtained
post-petition financing, it would have been "well within its
rights" to pay him his full contract rate of salary post-
petition.  <u>See, e.g.</u> 11 U.S.C. § 363(c)(1) (authorizing trustee
to use property of the estate in the ordinary course of business
without notice or court approval); 11 U.S.C. § 1108 (authorizing

---

[4]  Dr. Barenberg testified that he has an extensive educational
and professional background in macromolecular science.  He was
the Debtor's founder and had invented the Debtor's proprietary
technology.

trustee to operate the debtor's business); 11 U.S.C. § 1107
(giving debtor in possession all the powers of a trustee).

Dr. Barenberg overstates the importance of his Employment
Contract.  Because the Employment Contract was never assumed by
the Debtor post-petition, it was not binding on the estate.
Mason, 330 F.3d at 44.  Thus, although it "may be probative of
the reasonable value [of post-petition services], it is not the
dispositive measure."  Id.  See also In re Kaber Imaging, Inc.,
262 B.R. 187, 189 (Bankr. D.N.H. 2001) ("Unlike rent due for
nonresidential real estate pursuant to § 365(d)(3), the Court is
under no obligation to enforce the contract terms of an unassumed
prepetition employment contract.").

In this case, the Court finds the Employment Contract
minimally probative of the value of Dr. Barenberg's post-petition
services because of his actual employment history with the
Debtor.  From 1994 to 1999, Dr. Barenberg's annual salary under
the Employment Contract was $160,000.  In 2000, the Debtor's
board of directors increased this to $250,000, plus a one-time
bonus of $100,000.  The only time the Debtor actually paid
$250,000 in annual salary to Dr. Barenberg, however, was in
2000.[5]  Since then, Dr. Barenberg has drawn steadily less salary
from the Debtor, receiving only $80,640 in 2004.

---

[5] According to his tax returns, Dr. Barenberg received $459,246
in compensation from the Debtor in 2000, although it is not clear
what those payments represented.

6

Dr. Barenberg attributes the Debtor's failure to pay his full salary pre-petition to its financial troubles.  He described the Debtor as a "classic startup company" that filed for chapter 11 because it "ran out of money" as a result of litigation over a pre-petition patent license agreement.  He testified that he had attempted to rehabilitate the Debtor by deferring his compensation.[6]

The Court cannot conclude that Dr. Barenberg's post-petition services are reasonably valued, for administrative expense purposes, at a rate more than three times the amount the Debtor paid for those same services immediately prior to its chapter 11 filing.  Dr. Barenberg knowingly and voluntarily assumed the economic risk of non-payment by deferring his compensation pre-petition when the Debtor was running out of money.  He cannot, now that the Debtor has actually run out of money, draw his full salary for the first time in four years as an administrative expense.  See, e.g., In re Zerodec Mega Corp., 39 B.R. 932, 935 (Bankr. E.D. Pa. 1984) (authorizing post-petition employment of Debtor's CEO at only two-thirds of his contract rate, because it was the amount he had actually received pre-petition).

On this record, the Court finds no principled basis for valuing Dr. Barenberg's post-petition services as CEO at a rate

---

[6]  In addition to the instant Request, Dr. Barenberg has filed a proof of claim seeking more than $2 million in unpaid pre-petition compensation and medical benefits allegedly due under the Employment Contract.

7

higher than his effective rate of pay in the year prior to the
Debtor's bankruptcy filing.  Accordingly, the Court finds that
the reasonable value of Dr. Barenberg's post-petition services,
if they were beneficial to the estate, was no more than $26,880.

     2.  <u>Benefit to the Estate</u>

Dr. Barenberg is entitled to an administrative expense
claim, however, only if his post-petition services as CEO
resulted in a benefit to the estate in excess of the $24,000 he
has already received.  <u>See, e.g.</u>, <u>Kaber Imaging</u>, 262 B.R. at 191
(denying administrative expense request where amounts received by
claimant post-petition were "fair consideration for the actual
and necessary benefits received by the Debtors as a result of his
employment").

Dr. Barenberg testified that during the post-petition, pre-
conversion period he worked "24/7" on behalf of the Debtor.
Specifically, he spent his time (1) building up the Debtor's
business and maintaining its operations, which entailed, inter
alia, traveling to manufacturing facilities in Thailand, China,
and Singapore; (2) preparing the various forms and schedules
required by the chapter 11 proceeding; and (3) obtaining
financing necessary to cure pre-petition defaults under a key
intellectual property licensing agreement and to provide working
capital to hire new employees.

The UST argues that, given the various problems with this
case that ultimately led to its conversion from chapter 11 to
chapter 7, any alleged benefit to the chapter 11 estate resulting
from Dr. Barenberg's post-petition employment is "highly
suspect."  The Trustee agrees, adding that Dr. Barenberg's annual
salary of $250,000 represents approximately 17% of the value of
the entire company based on the sale price received by the
estate.  Allowing Dr. Barenberg to be paid at this excessive rate
as an administrative expense, the Trustee argues, would be
fundamentally unfair to the estate's other creditors.

    a.   <u>Maintaining Operations</u>

The UST argues, as it had in its motion to convert the case,
that the Debtor had no operations of its own and was merely a
holding company for a non-debtor Singaporean affiliate (the
"Subsidiary").[7]  According to the Debtor's monthly operating
reports, upstream payments from the Subsidiary were the Debtor's
sole source of revenue, though there was no agreement between the
Debtor and the Subsidiary requiring such payments.  The UST
argues, therefore, that any work "building up business" and
"maintaining operations" was performed for the benefit of the
Subsidiary and not the chapter 11 estate.

---

[7]  According to Dr. Barenberg, the Debtor owned all the stock of
a non-debtor holding corporation, which in turn owned all the
stock of the Subsidiary.

9

Dr. Barenberg testified that the Debtor and the Subsidiary always operated as a single enterprise and that their separate incorporation was driven solely by tax considerations.  In the ordinary course of business, Dr. Barenberg marketed the Debtor's proprietary technology (which prevents the transmission of biological contamination) to potential purchasers of goods that incorporated the technology into their design (e.g., surgical gloves).  Purchasers executed purchase orders in favor of the Subsidiary, which in turn sub-contracted with Asian manufacturers for production of the goods.  Dr. Barenberg traveled throughout Asia to inspect the quality of the prospective manufacturers' factories and operations and to oversee the manufacturing process.  The manufacturers shipped the goods directly to the purchasers, who paid the Subsidiary upon receipt.  The Subsidiary, in turn, transferred funds to the Debtor to pay Dr. Barenberg's salary and expenses.  Dr. Barenberg testified that his post-petition marketing efforts produced two major purchase orders for the Subsidiary.

Under the circumstances, however, the Court cannot ignore the Debtor's and Subsidiary's separate existence and conclude that services performed for one necessarily benefitted the other. See In re Owens Corning, 419 F.3d 195, 211 (3d Cir. 2005) ("[T]he general expectation of . . . the Bankruptcy Code . . . is that courts respect entity separateness absent compelling

10

circumstances calling equity . . . into play.").  The Debtor was
not a party to either of the two purchase orders received by the
Subsidiary post-petition.  Further, there is no evidence that the
Subsidiary was obligated to make any payments to the Debtor as a
result of those purchase orders.  The Debtor's interest, if any,
in the proceeds of the Subsidiary's accounts receivable was a
result of its indirect ownership of the Subsidiary.  As such, it
was merely speculative.  "[S]uch speculation is too attenuated to
support a § 503(b)(1)(A) claim.  The benefit to the estate must
be actual, not potential."  <u>In re Allen Care Ctrs.</u>, 163 B.R. 180,
188 (Bankr. D. Or. 1994).

     The Court recognizes that the creation of receivables in
favor of the Subsidiary could conceivably increase the value of
the Subsidiary's stock, which was indirectly an asset of the
Debtor.  Dr. Barenberg, however, presented no evidence of the
amount of the post-petition purchase orders, the status of the
completion of the goods ordered, or the extent, if any, the
potential receivables increased the price paid for the Debtor's
assets.  Accordingly, Dr. Barenberg did not meet his burden of
demonstrating an actual benefit to the estate from the services
he performed for the Subsidiary.

          b.   <u>Services Incidental to Chapter 11 Case</u>

     As the Debtor's sole employee, Dr. Barenberg was the only
one in a position to discharge the Debtor's duties under the

Bankruptcy Code.  While the discharge of these duties ordinarily provides a benefit to the estate, it was largely the Debtor's failure to discharge them properly that led to the conversion of this case to chapter 7.

Specifically, as outlined in both the UST's motion to convert the case and its objection to the instant Request, the Debtor (1) failed to explain the exact nature of its relationship with the Subsidiary; (2) did not provide certificates of post-petition insurance coverage; and (3) failed to provide an explanation of what intellectual property it owned despite at least three requests from the UST.

There were also numerous discrepancies between the Debtor's accounting records and its Schedules, the details of which are outlined in the Declaration of Michael West submitted in connection with the UST's motion to convert the case.[8]  The Debtor's post-petition monthly operating reports ("MORs") also

---

[8]  These discrepancies included: (1) accounts receivable, equipment, and raw materials scheduled with an aggregate value of $802,000 which did not appear on the Debtor's books; (2) priority claims of Dr. Barenberg and other insiders scheduled for more than the Debtor's books reflected as due; (3) stocks of subsidiaries, which had a book value of only $1.5 million, scheduled at a value of $12.5 to $50 million; and (4) licenses, franchises, and other general intangibles, having a book value of $1.08 million, scheduled at a value of $2.85 to $52.85 million. Though the Schedules are meant to list the fair market value, rather than the book value, of the Debtor's assets, the ultimate sale of those assets evidence that the values listed by the Debtor on its Schedules were substantially more than the fair market value.

12

contained numerous inconsistencies.[9]

The Debtor had both a motive and an opportunity to explain these deficiencies at the May 5 conversion hearing.  It did not do so.  Instead, it offered testimony about the various practical applications of its proprietary technology and its chances of a successful reorganization if the Court would only approve its proposed financing.

The Debtor's failure to disclose adequately its assets, liabilities, and revenues made it impossible for the Court to evaluate the Debtor's prospects for a successful reorganization, resulting in denial of the financing motion and conversion of the case.  As the Debtor's CEO and sole employee, Dr. Barenberg was responsible for this failure.  Indeed, the Debtor's first witness at the May 5 hearing, an investment banker, testified that in his opinion the Debtor "lack[ed] management" and would require new management in order to reorganize successfully.  Dr. Barenberg, though he was in attendance at the hearing, did not testify.

Though some of Dr. Barenberg's efforts did benefit the estate, under the circumstances, the Court concludes that the

---

[9]  Those inconsistencies included: (1) the Debtor failed to record expenses such as intellectual property maintenance, license fees, and salary, resulting in an overstatement of income; (2) the Debtor received only $19,985 in revenue from the Subsidiary in January and February 2005 even though $112,000 was budgeted to be received; and (3) the Debtor recorded revenue of $75,000 from the Subsidiary on its February 2005 MOR even though it received nothing.

$24,000 received by Dr. Barenberg post-petition adequately compensated him for any benefit to the estate that resulted from his post-petition employment.  Accordingly, the Court will deny the Request for any additional post-petition salary.  See, e.g., Kaber Imaging, 262 B.R. at 191.

       C.   Post-Petition Expense Reimbursements

         1.   Insurance Premiums and Physical Examination

Dr. Barenberg seeks $500 for his annual physical examination and $3,206.50 for the pro-rata portion of life and disability insurance premiums he paid.  Dr. Barenberg testified that the Debtor had routinely reimbursed him for these expenses, though nothing in the Employment Contract requires this.

The Court will deny this portion of the Request because (1) the Employment Contract does not provide any entitlement to these expenses, and (2) there is no evidence that the estate received any benefit from those payments.

         2.   Business Travel

Dr. Barenberg also seeks reimbursement of $15,851.63 in alleged business travel expenses for trips to Beijing, Bangkok, Singapore, San Antonio, Cleveland, and Wilmington during the post-petition, pre-conversion period.  Dr. Barenberg testified that he traveled to Wilmington to attend various hearings in the Debtor's chapter 11 case, to Cleveland in an effort to obtain financing, and to the various other locales in an attempt to

14

generate purchase orders for the Subsidiary.

At the hearing, the Court requested additional documentation to support this Request.  In response, Dr. Barenberg submitted expense reimbursement forms typically used by the Debtor pre-petition totaling $32,843.63, along with assorted receipts.[10]

As an evidentiary matter, Dr. Barenberg's documentation is incomprehensible.  Perhaps not surprisingly, the receipts submitted in connection with the Asian trips are in foreign currency, and many of them are in a foreign language.  Dr. Barenberg provided no guidance to assist the Court in interpreting these documents or matching them to the expense forms.  The latter are in United States currency and state the amounts sought by category only, without any itemization.  Absent that guidance, the Court found support in the receipts for only $7,639.29 of the amounts alleged on the expense forms.

With respect to the expenses incurred by Dr. Barenberg in traveling in Asia, the Court concludes that none of them are allowable as administrative expenses at any rate.  Those travel expenses were incurred in efforts to obtain business for the Subsidiary and in monitoring the performance of the Subsidiary's sub-contractors.  As found above, the services performed on behalf of the Subsidiary did not benefit the Debtor's chapter 11

---

[10]   Dr. Barenberg testified that he had already been reimbursed approximately $17,000 for his post-petition travel expenses. Accordingly, the Request seeks only the unreimbursed amount.

estate.    Thus, the Court must conclude that the related travel expenses similarly provided no benefit.

The Court concludes, however, that Dr. Barenberg's attendance at hearings in Wilmington and attempts to procure financing provided some benefit to the estate.    Nonetheless, the total reimbursement sought for those trips is $6,157.61 (only $5,740.59 is supported by the receipts submitted).    This amount is substantially less than the $17,000 already received post-petition by Dr. Barenberg as reimbursement for his expenses. Because Dr. Barenberg has already been reimbursed for the only trips that might have benefitted the estate, his Request for travel expenses will be denied.    See, e.g., Kaber Imaging, 262 B.R. at 191.


IV.    CONCLUSION

For the reasons set forth above, the Court concludes that Dr. Barenberg has not met his burden of establishing his entitlement to an administrative expense claim.    His Request is therefore denied.    An appropriate Order is attached.


By the Court,


Dated: April 13, 2006

Mary F. Walrath
United States Bankruptcy Judge


16